541 So.2d 423 (1989)
In the Matter of the ESTATE OF Charles Maurice ANDERSON, Deceased.
Howard W. DAVIS
v.
DEPOSIT GUARANTY NATIONAL BANK, Executor of the Last Will and Testament of Charles Maurice Anderson, Deceased, and Trustee of Charles Maurice Anderson, Testamentary Trust.
No. 58603.
Supreme Court of Mississippi.
February 22, 1989.
Rehearing Granted in Part and Opinion Modified March 22, 1989.
*424 Douglas E. Hassell, Ward, Martin & Terry, Vicksburg, William M. Champion, University, for appellant.
T.F. Badon, Liberty, for Deposit Guaranty National Bank.
D. Reginald Jones, Liberty, for heirs of Fred A. Anderson, Jr.
EN BANC.
ROBERTSON, Justice, for the Court:

I.
Today's testator, a bachelor during his lifetime, by will made substantial bequests to his favorite nephew. The rest of his estate he placed in trust to provide for the education of his nephews and nieces for the next twenty-five years, at the end of which the trust corpus and any undistributed income will also go to the favorite nephew.
We are told that the bequest in trust violates the Rule against Perpetuities, and by this we are told that testator has misjudged the nephew much more than the measure of the Rule.
The Chancery Court rejected the attack and upheld the trust. With but slight modification, we affirm.

II.
Charles Maurice Anderson, late of Amite County, Mississippi, died December 12, 1984. Anderson was never married and had no children. Anderson was one of three children of Mr. and Mrs. Fred Alvin Anderson, Sr., the other two being Fred Alvin Anderson, Jr., his brother, and Helen J. Waitzman, his sister. Anderson was predeceased by both of his parents, and by his brother and his sister.
At the time of his death, Charles Maurice Anderson provided for a last will and testament which left a number of specific bequests to Howard W. Davis, his nephew, who is the son of testator's deceased sister. Davis is presently 53 years of age and is alive and well and living in Gloster, Mississippi. The portion of the will at issue today is Item IX which reads as follows:
I hereby direct that the Deposit Guaranty National Bank of Jackson, Mississippi, take into its absolute control and handle as trustee the following described property, to-wit:
(Then follows the description of approximately 960 acres of land.)
The trustee shall use all of the income derived from the above described property, be it timber, minerals or other such income which may develop in the future, for the education of the descendants[[1]] of F.A. Anderson, Sr. for a period of twenty-five (25) years from the date of the admission of this last will and testament for probate. The trustee shall not be authorized to sell and dispose of the real property but only use the income therefrom and it shall do so without any limitation whatsoever. Also to be used in the same manner for the same purpose, that being the education of the descendants of F.A. Anderson, Sr., for a period of twenty-five (25) years from the date of the admission of this last will and testament for probate shall be all of the income developed from my interests in oil, gas and mineral rights including, but not necessarily limited to *425 that portion of Magnolia State Oil & Land Company which I own and any other minerals which I own or in which I may have an interest, and minerals which may in the future become mine or part of my estate. I direct that my trustee not allow any one of the descendants of F.A. Anderson, Sr., to take advantage of the educational benefits which may be derived under this item but ask that the trustee be as liberal with each as possible. At the conclusion of the twenty-five year period for which this trust is created, then I give, devise, and bequeath the real property and all of the oil, gas and minerals, which may then be in, on or under the property to Howard W. Davis and any money or securities which may still be in the educational fund at the end of the twenty-five years should likewise be delivered to Howard W. Davis, and in the event of his death prior to his taking, then to the heirs of his body.[[2]] [emphasis added]
The principal assets of the testator's estate consist of
(a) 960 acres of land and minerals, valued at the time of trial at $660,179.10, and devised in trust;
(b) a 41 1/3% interest in Magnolia State Oil & Land Company valued at the time of trial at $86,136.05, devised in trust;
(c) the residuary estate, which has been bequeathed to Howard W. Davis under Item X of the will subject to pecuniary legacies in the amount of $6700.00 under Items VII and VIII, and payment of taxes and administrative expenses; and
(d) various lots in the town of Gloster (including the testator's home and all contents therein) and all personal property, bequeathed to Howard W. Davis under Items III and VI of the will.
The descendants of the testator's late father, Fred Alvin Anderson, Sr., a/k/a F.A. Anderson, Sr., living on December 12, 1984, included five grandchildren and ten great-grandchildren. Two more great-grandchildren have been born since that date.[3]
*426 The will of Charles Maurice Anderson was admitted to probate in the Chancery Court of Amite County, Mississippi, on December 21, 1984, nine days following Anderson's death. Subsequently, for reasons not clear in the record, Deposit Guaranty National Bank of Jackson, Mississippi, the executor of the will and one of the appellees here, petitioned the Court for probate of the will in solemn form. On February 5, 1986, the Chancery Court admitted the will to probate in that form.
On March 14, 1986, the Bank as Executor filed a petition for construction of will and for instructions. Specifically, the Executor requested interpretation of Item IX of the will of Charles Maurice Anderson, which has been quoted above.
On April 10, 1986, Howard W. Davis filed a response, arguing that (a) Paragraph IX violates "the Rule against Perpetuities" because, by its terms, it will last for twenty-five (25) years and also it has an indefinite time of commencement; (b) the terms of the trust are too vague, uncertain and narrow; (c) the terms are too ambiguous; (d) the beneficiaries are an uncertain class; and (e) the cumulative effect of all of the above. Davis later amended his pleadings and made alternative prayers in the event the trust was not held void, including (1) that the term of the trust be attenuated to conform to the Rule against Perpetuities, twenty-one (21) years; (2) that the forced heirship should Howard W. Davis die before the maturity of the trust be vitiated and that Howard W. Davis be able to transfer his remainder interest by last will and testament; and (3) that education be strictly defined.
The matter came on for hearing before the Chancery Court of Amite County on August 12, 1986. There were several stipulations entered at the time, the following of which are most relevant:
(1) The prospective trust assets are identified in Paragraph IX of the will and all prospective trust property and income therefrom is ascertainable by reference to the will and other documents including instruments filed in the office of the Chancery Clerk and the records of Magnolia State Oil and Land Company.
(2) If the trust is determined to be valid, then the testator's purpose in creating the trust is for the education of the descendants of F.A. Anderson, Sr.
(3) If the trust is determined to be valid, then the court should set objective standards or guidelines for the trustee to apply in determining the eligibility and amount of educational benefits to be distributed.
(4) If the trust is determined to be valid, then the Uniform Trustees' Powers Law, Miss. Code Ann. §§ 91-9-101, et seq. (1972), and the Uniform Principal and Income Law, Miss. Code Ann. §§ 91-17-1, et seq. (1972), are applicable to the Anderson trust.
In a decision rendered by letter dated December 26, 1986, and by declaratory judgment construing will entered April 10, 1987, the Court found that a valid and enforceable private educational testamentary trust has been created under Item IX of the will of Charles Maurice Anderson; that the term of said trust commenced on December 12, 1984, the date of the testator's death, and will continue thereafter for a period of twenty-five (25) years or twenty-one (21) years from and after the death of Howard W. Davis, whichever first occurs; that the trust will be unenforceable only to the extent that the term may exceed the lifetime of Howard W. Davis, plus twenty-one years; and, by reasons thereof, the term of the trust does not violate the Rule against Perpetuities and does not constitute an unlawful restraint on alienation.
*427 The Court further declared that Howard W. Davis holds a non-possessory vested remainder interest in trust property, which is subject to complete defeasance in favor of the heirs of his body in the event he should die prior to termination of the trust term, and said vested remainder interest is transferable by conveyance or devise with right of possession and enjoyment to vest upon termination of the trust, subject to the executory interest of the heirs of the body of the said Howard W. Davis.
Under Paragraph V the Court held:
(1) That the descendants of F.A. Anderson, Sr., now living and hereafter born during the period of the trust, constitute a well defined class, and, by due diligence of the trustee, members of that class can be ascertained at all stages of trust administration.
(2) That the interests of the beneficiaries of the trust are in the income derived or to be derived from trust property to the extent that individual descendants qualify for educational benefits. There is no requirement that the descendants are to receive equal shares, nor is there any requirement that each and every descendant must receive a portion of trust income, and the court declared that the testator authorized the trustee to exercise his discretion in determining qualifications for educational benefits and the amount, time and manner of such payments.
(3) That the testator granted the trustee absolute control and management of trust assets, and that the trustee was vested with such title as was necessary for purposes of trust administration, including full possession of all trust property with the right to manage, operate, improve, protect and maintain the same, and to use the income therefrom to provide educational benefits for the descendants of F.A. Anderson, Sr., and to pay trust expenses.
(4) That the provisions of the trust are sufficiently clear and unambiguous so as to enable the trustee to administer and carry out the purpose of the trust.
(5) That, in addition to the powers granted in the last will and testament and the statutory powers enumerated in the Uniform Trustees Powers Law, there is also vested in the trustee by necessary implication sufficient discretion to administer the trust estate with such reasonable and prudent economy as may be required to accomplish the ultimate object and real intent of the testator. Additionally, the trustee was directed to formulate and adopt a plan for implementation of the trust to include, among other things:
(1) a general description of plans for administration of the trust and management of trust property; (2) objective standards/criteria for eligibility to receive educational benefits; (3) manner and method of disbursement of funds including proof of enrollment and/or registration in an educational institution and proof of the amount of tuition.

III.
On April 17, 1987, Howard W. Davis gave his notice of appeal to this Court, where he makes essentially a three-part argument:
(1) The provision of the trust that gives educational benefits to the descendants of F.A. Anderson, Sr., creates executory interests in them. Thus, the interests are contingent. These interests may fail to vest within the period of the Rule against Perpetuities, so they are void. The Chancery Court below saved these interests by applying either cy pres or equitable approximation, and this was error.
(2) The alternate interest created in the heirs of Howard W. Davis' body upon the termination of the trust also violates the Rule against Perpetuities and also should not have been saved by either cy pres or equitable approximation.
(3) The trust is void because its terms are vague, ambiguous or indefinite.

IV.

Does the Twenty-Five Year Private Educational Testamentary Trust Violate the Rule Against Perpetuities, and Thus Fail?

A. The Rule Declared

That a person may by will devise his property as he or she sees fit is in our law *428 a premise of the first rank, though not without qualification. Tinnin v. First Bank of Mississippi, 502 So.2d 659 (Miss. 1987); May v. Hunt, 404 So.2d 1373, 1376 (Miss. 1981); In Re Estate of Granberry, 310 So.2d 708, 711 (Miss. 1975). The premise is an outgrowth of our law's respect for rights of private property.
The surest guide to testamentary intent is the wording employed by the maker of the will. Indeed, the intention of the testator is to be found, not in what he intended to say but what he did say. Ferguson v. Morgan, 220 Miss. 266, 271, 70 So.2d 866, 867 (1954). We have authority to give effect to the testator's intent only where that intent has received some form of direct or reasonably implied expression in the will. Tinnin v. First Bank of Mississippi, 502 So.2d 659, 663 (Miss. 1987); Byrd v. Wallis, 182 Miss. 499, 516, 181 So. 727, 732 (1938); Weems, Mississippi Wills and Estates § 9-3, p. 286 (1983).
Yet our society has conflicting needs.
Public convenience today demands a rule of law (1) that will limit "dead hand" control over property which prevents the present generation from using the property as it sees fit, (2) that will keep property marketable and available for productive development in accordance with market demands, and (3) that will curb trusts which can protect wealthy beneficiaries from creditors, decrease the amount of risk capital available for economic development and, after a period of time and change in circumstances, tie up the family in disadvantageous and undesirable arrangements.[4]
One response our law has made to these concerns has been the promulgation and enforcement of the Rule against Perpetuities. Seen in its best light, the Rule represents a balancing of the interests of the present owner in controlling his property well into the future against the future owner's interests in unrestricted use and alienability. We approach the Rule as no other, having in mind Holmes' ideas of the historical development of law.[5] On the one hand, our experience with the Rule exemplifies the "historical tendency of property law to forget the original reason for its rules and to reduce principles to logic."[6] On the other hand, we regard the treatment of the Rule as a theorem, as a rule of logical proof, if you will, and the untoward, if not absurd, results so generated, as a major force fueling the flames of common sense and fidelity to principle and purpose which have marked this state's experience in recent times.
The Rule has its origins in common law England. See, e.g., Duke of Norfolk's Case, 3 Ch.Cas. 1, 22 Eng.Rep. 931 (1682); Jee v. Audley, 1 Cox 324, 29 Eng.Rep. 1186 (Ch. 1787). We need not recross the Atlantic on the Mayflower,[7] however, as what is important today is that the Rule has been posited among the law of this state via the articulate voice of this Court. Our cases afford a variety of forms of expression of the Rule.[8] While perfection in expression *429 is an illusion no court should expect to achieve, we regard the best phrasing of the Rule as follows:
No interest is good unless it vests within twenty-one years after the death of all persons in being when the interest is created who can affect the vesting of the interest.[9]
The Rule against Perpetuities is concerned with the remoteness of vesting and not with the duration of vested interests.[10]May v. Hunt, 404 So.2d 1373, 1376 (Miss. 1981); Phelps v. Shropshire, 254 Miss. 777, 183 So.2d 158, 163 (1966); Carter v. Berry, 243 Miss. 321, 358, 140 So.2d 843, 846 (1962). One policy assumption of the Rule is that vested interests are not objectionable but contingent interests are. The Rule is not concerned with whether an interest vests in possession or enjoyment. If there is a present right to a future possession, though that right may be defeated by some future event, contingent or certain, there is nevertheless a vested estate. Hays v. Cole, 221 Miss. 459, 471, 73 So.2d 258, 263 (1954); see also Clobberie's Case, 2 Vent. 342, 86 Eng.Rep. 476 (Ch. 1677) (a gift of income, with principal payable at a designated age, vests the principal). A gift that is vested with possession postponed satisfies the vesting requirement of the Rule against Perpetuities, although, having in mind the purposes of the Rule, it is not clear upon reason why this should be so. Indeed, all of this is at best, crudely  and at worst, inexplicably  related to the three general policy considerations noted at the outset.
In classifying interests as vested or contingent, we distinguish carefully (although arguably artificially) between conditions precedent and conditions subsequent. A condition precedent is an event that, under the terms of the instrument, must occur before the interest vests. An interest subject to a condition precedent is contingent. By way of contrast, a condition subsequent refers to an event that cuts short an interest if the event happens. Or, as we sometimes put it, a condition subsequent describes a condition which, if it occurs, will divest a vested interest. Hays v. Cole, 221 Miss. 459, 471, 73 So.2d 258, 263 (1954). An interest that is vested subject to divestment is not within the Rule against Perpetuities which is concerned solely with contingent interests. See generally Bridgforth v. Gray, 222 So.2d 670, 672 (Miss. 1969).
The very able brief of Appellant Davis concentrates upon Gray's traditional statement of the Rule and then struggles mightily to avoid the import of this state's three major modifications of the Rule:
(1) Our shifting of emphasis from what-might-happen to wait-and-see, C & D Investment Co. v. Gulf Transport Co., 526 So.2d 526, 530 (Miss. 1988); Phelps v. Shropshire,[11] 254 Miss. 777, 785, 183 So.2d 158, 162 (Miss. 1966);
(2) the abolition of the all-or-nothing rule for class gifts, Carter v. Berry, 243 Miss. 321, 140 So.2d 843 (1962), noted in 76 Harv. L.Rev. 1308 (1963);[12] and
*430 (3) the empowerment of our courts to imply a savings clause[13] into any devise which would otherwise violate the Rule, to become operative only when it becomes apparent that remote vesting will otherwise occur.
Indeed, reflection upon the argument advanced by Appellant Davis makes clear that at least for today far greater inconvenience may result from the dead hand of John Chipman Gray than from the dead hand of Charles Maurice Anderson.

B. The Rule Applied

These general considerations before us, we turn to the elements of the Rule against Perpetuities, as modified, and their application to the facts of this case. We first search for the measuring lives. The Rule tells us these must be persons who were alive when the interest was created. Which of the millions of persons who inhabited this earth on December 12, 1984  the day Charles Maurice Anderson died  are the measuring lives? Our law is clear that we are not limited to persons whose names appear in the testator's will. Hughes v. Miller, 384 So.2d 608, 610 (Miss. 1980); Carter v. Berry, supra, 243 Miss. at 362, 140 So.2d at 848. Instead, we canvass those persons implied by the creating instrument, necessarily involved in the limitations contained therein, or, as we prefer to put it, who can affect the vesting of the interest.[14] We do not inquire whether the testator intended the particular lives in question to be the measuring lives, nor need those persons take anything under the instrument. Carter v. Berry, 243 Miss. at 362, 140 So.2d at 848. Where there is a choice among more than one life in being at *431 the creation of the interest, one who can save the interest must be selected.
The search for the measuring lives has been well summarized by Prof. Jesse Dukeminier:
To find this validating life, logic requires us to use a two-step process of analysis. First, we start with this proposition: If a validating life is found, it will necessarily be found among the lives that can affect vesting, and no others. Hence, we assemble a pool of all persons alive who can affect vesting of the interest in some way. Persons who cannot affect vesting are irrelevant. Second, with respect to each person in the pool, we ask whether the interest will necessarily vest or fail within the life of such person or upon, or within twenty-one years after, such person's death. If we find a person in the pool by whom the necessary proof can be made, we have found the validating life. If, on the other hand, we cannot make the required proof by reference to any person in the pool, there is no life that validates the gift; the gift is void unless it must vest or fail within twenty-one years. A conclusion that the gift is void implicitly says that all causally-related lives have been tested and found useless in making the requisite proof.[15]
We add as a caveat: the conclusion that the gift is void is subject to the Mississippi modifiers: wait-and-see, abolition of all-or-nothing, and implied savings clause.
The Court below and the parties in their briefs appear to assume that Howard W. Davis is the measuring life, perhaps because his is the name mentioned in the will. No one articulates any reason why this should be so. But a moment's reflection upon our rules regarding the search for the measuring lives makes clear that all persons who are descendants of F.A. Anderson, Sr. and who were alive on December 12, 1984, are eligible, measuring, validating lives. See footnote 3 above. Will the interest vest within twenty-one years after the death of all descendants of F.A. Anderson who were in being on December 12, 1984?
By Item IX of his will, Charles Maurice Anderson created a trust for the "education" of the descendants of F.A. Anderson, Sr. The interests of each of these descendants will vest only upon his or her qualifying for the educational benefits provided by the trust. No wording in the will demands that each and every descendant receive a portion of the trust income. While all are potentially eligible for an interest, each must satisfy the stated requirement before receiving it. As each of the descendants of F.A. Anderson, Sr. must qualify for the educational benefits of the trust  according to guidelines to be developed by the trustee  before he or she becomes entitled to so much as a penny, we regard the interest of each as subject to a condition precedent and, accordingly, contingent, not vested.
Recall that the trust is to terminate "twenty-five years from the date of the admission of this last will and testament for probate," the termination date thus being December 21, 2009. As of December 12, 1984, the date of the death of Charles Maurice Anderson, it was theoretically possible that all of the descendants of F.A. Anderson, Sr. would die more than twenty-one years before the scheduled termination of the trust. It was also possible that no descendant of F.A. Anderson, Sr. would qualify for benefits within the term of the trust. If we turn back the clock to December 12, 1984, and look at the facts as they then existed, the conclusion was then inescapable the interest created by Item IX of the will might not vest within twenty-one years after the death of all persons in being on December 12, 1984, who could affect the vesting of the interest. From this conclusion, invoking the dead hand of John Chipman Gray, Appellant Davis argues that the Rule must be "remorselessly applied."[16] Our law demurs, and with authority.
*432 One evil experience has revealed is that treating the Rule as a rule of logical proof and mechanical application produces distributions of property neither intended nor desired by the testator. See Carter v. Berry, 243 Miss. at 370, 140 So.2d at 852. Established within our law is the principle that a person's will should be enforced so as to avoid clearly unintended consequences. Tinnin v. First Bank of Mississippi, 502 So.2d 659, 669 (Miss. 1987); Estate of Bunch v. Heirs of Bunch, 485 So.2d 284, 285 (Miss. 1986). Any reader of the will at issue may say with confidence that Charles Maurice Anderson did not intend[17] that Howard W. Davis take Anderson's entire estate to the exclusion of the educational needs of Anderson's nieces and nephews and their children. It is this conclusion that triggers the Court's responsibility to apply one or more of our ameliorative doctrines and save this testamentary trust.
West Virginia considered a legally analogous twenty-five year private educational testamentary trust in Berry v. Union National Bank, 164 W. Va. 258, 262 S.E.2d 766 (1980), and invoked "equitable modification" and reduced the term of the trust to twenty-one years. The West Virginia Court cites Carter v. Berry as evidence of "a developing trend to ameliorate the harsh consequences of `remorseless application' of the rule." Berry, 164 W. Va. at 265, 262 S.E.2d at 770, n. 8 and accompanying text. Carter v. Berry would indeed authorize a like result here.
Sufficient unto the day is our wait-and-see doctrine, an alternative to Carter v. Berry which ought here be employed as it may save all, not just most, of Charles Maurice Anderson's private educational testamentary trust. Under wait-and-see, the validity of an interest is not judged by what might happen, but rather by what does happen, by whether the interest in fact vests or fails within the perpetuities period.[18]C & D Investment Co. v. Gulf Transport Co., 526 So.2d at 530.
For one thing, the record reflects that by the time of trial (August, 1986), several beneficiaries had already qualified for and received substantial educational benefits. Some income and, of course, the entire *433 principal remained untouched, in 1986 and, we presume, today as well. It is true that what remains may never vest in any member of the beneficiary class, as it is possible that no further descendants of F.A. Anderson, Sr., may qualify for educational benefits. That the interests thus remain contingent is no longer of concern, as the period of the Anderson testamentary trust will end on December 21, 2009, which is less than twenty-one years from this day. As there are now in being a host of measuring lives,[19]see footnote 3 above, we may say with certainty that all interests created under the testamentary trust will either vest or fail within twenty-one years after the end of all measuring lives.[20] "There is no precedent in this state which compels us to close our eyes to the facts occurring after the death of the testat[or]." Phelps v. Shropshire, 254 Miss. at 785, 183 So.2d at 162; quoted in C & D Investment Co., 526 So.2d at 529.
Davis' able counsel notes that the result we decree: that the trust be upheld, would allow this private educational testamentary trust to "go on for twenty-five years." Counsel tells us that this "not only violates the Rule against Perpetuities, it makes a shambles of it." The point revealed is that the Rule itself, at least without the Mississippi modifiers, is a shambles. But a moment's reflection reveals that an adept lawyer can tie up property "for an unconscionable period  viz., twenty-one years after the deaths of a dozen or so babies chosen from families noted for longevity, a term which, in the ordinary course of events, will add up to about a century."[21] If this be so, what sense does it make that the mere twenty-five years the Anderson trust will last are too much?[22] Moreover, the twenty-five years these trust assets will be dominated by Charles Maurice Anderson's dead hand pale into insignificance when compared with the ninety year wait-and-see period which is the centerpiece of the new Uniform Statutory Rule Against Perpetuities promulgated in 1986 by the National Conference of Commissioners on Uniform State Laws.[23] 8A U.L.A. 80 (Supp. 1987).
Notions of wait-and-see and an implied savings clause may be found in our cases dating back at least two decades, and in that sense our decision this day is nothing new. On the other hand, we have never recognized the two so forcefully as today. We need not sacrifice civil justice on the altar of legal formalism or the purist's nostalgia, as it is beyond comprehension *434 that Howard W. Davis, or any other citizen of this state, has in fact placed legally cognizable reliance  to his detriment  upon the dead hand Rule of John Chipman Gray. See Tideway Oil Programs, Inc. v. Serio,[24] 431 So.2d 454, 465-66 (Miss. 1983).

V.

Do The Interests Created In The Heirs Of Howard W. Davis Violate The Rule Against Perpetuities?
Here Howard W. Davis claims that the remainder interests created in his heirs are executory, contingent on their surviving until the trust terminates with Howard W. Davis having already died. Davis' target is the language "at the conclusion of the twenty-five year period for which this trust is created then I give, devise and bequest the real property ... and in the event of his death prior to his taking, then to the heirs of his body".
Howard W. Davis' remainder interest thus created is vested, subject to being defeated if he does not survive December 21, 2009. Leach and Tudor, The Rule Against Perpetuities § 24.20 (1957) ("an executory interest in an ascertained person to take effect at a specific date should be considered `vested' within the meaning of the rule against perpetuities"). The interests of the heirs of Davis' body are contingent upon Davis dying before December 21, 2009. In light of what we have said above, the answer is simple. We have waited and seen and Howard W. Davis is very much in being. The interests of the heirs of Davis' body, contingent though they are, will vest or fail on or before December 21, 2009, which is less than twenty-one years from this day.[25]
The assignment of error is denied.

VI.

Whether The Terms Of The Trust Created By The Testator Are So Vague, Ambiguous and Uncertain As To Render The Trust Void
Here Davis asserts that the term "education" is ambiguous, citing numerous examples of "education" which are non-traditional and claiming the trust gives no guidance as to which pursuits are or are not education. Next, the designation of beneficiaries makes the trust void for vagueness. So too does the fact that the phrase "not allow any of the descendants of F.A. Anderson, Sr. to take advantage" is uncertain, or so we are told.
We find no merit in Davis' challenge that "education" is too broad and ambiguous. We begin with the general premise that "If the trustee is to use trust funds to provide for the `education' of a beneficiary, the type of education to be furnished will depend on his express directions or the reasonable implications arising from all the circumstances of the case." Bogert, Trusts and Trustees § 811, p. 28 (2d ed. 1981).
There is a wonderful, old case on point concerning Martha Washington's devise of stock in trust for "the proper education" of *435 her three nephews and to fit them for some useful trade. Dandridge v. Washington's Executors, 2 Pet. (27 U.S.) 370, 7 L.Ed. 454 (1829). In part the dispute was whether the money should be limited to the pursuit of a mechanical trade or more broadly defined. Chief Justice Marshall wrote:
But we do not think the bequest is confined to the expense of acquiring the trade so as to be enabled to exercise it in the common way. Such does not appear to have been the intent of the testatrix. Her bounty is extended to the proper education of three relatives so that they may be severally fitted and accomplished in some useful trade. Their education is a primary object, as well as their acquisition of the trade, and when we consider the situation and character of the parties and the language of the will, we cannot doubt that the testatrix intended such education as would fit her relatives to hold a distinguished place in that line of life in which she designed them to move. The sum allowed for the object ought to be liberal such as would accomplish it if the fund from which it was to be drawn would admit of it.
Dandridge, 2 Pet. (27 U.S.) at 377, 7 L.Ed. at 457.
We have spoken directly to this issue. In Simpson v. Watkins, 162 Miss. 242, 139 So. 400 (1932), this Court was called upon to interpret provisions in what it deemed an "education will". One fourteen-year-old nephew then sued for expenses to attend a private boarding school as opposed to "the fine system of public schools" of Jackson, Mississippi. In affirming the trustee's allowance, the Court had this to say:
Education in its true sense means much more than the acquisition of knowledge out of the pages of textbooks. A testator having such a breadth of vision as this testator has, evidenced by his will, could scarcely have failed to have in mind that a true education includes the inculcation of the precept of a respectable economy and a just regard for the rights and interests of others.
Simpson, 162 Miss. at 250, 139 So. at 402. The Court concluded:
Without further length of elaboration we will quote and adopt the resume of the question at issue as made by the chancellor in his decree which resume is in the following words:
That the trustees are vested with sufficient discretion by necessary implication to administer the trust estate with such reasonable and prudent economy as may be required to accomplish the ultimate goal and real intent to the testator, and to this end may adopt reasonable plans, regulations and schedules for the submission and allowance of educational expenses of beneficiaries.
Simpson, 162 Miss. at 251, 139 So. at 402.
Other states have addressed the issue. In McGehee v. Smith, 248 Ala. 174, 26 So.2d 861 (1946), a trust in part for the "reasonable education" of testator's son was held to be broad:
The word "education" is a broad and comprehensive term and has a variable and indefinite meaning, and the appellants contend that the testator, by the use of the word "education" did not intend for the said trust funds to be used for the maintenance and support of Howard while he is in high school. The answer to this question thus raised depends upon the ascertained intent of the testator and this intention may be gathered not only from within the instrument itself, but also from the circumstances which surrounded the testator when the will was made, including the situation and condition of his estate, his relations with his family and beneficiaries, and their situation and condition.
McGehee, 248 Ala. at 178, 26 So.2d at 864.
A trustee whose duty it was to apply the trust income and principal to the support and education of a minor, bought him an automobile and supplies for it in order that the boy could commute to school and live outside a large city. The trustee's action was held valid. Indianhead National Bank v. Theriault, 97 N.H. 212, 84 A.2d 828 (1952). Under a trust which permitted the trustee to spend up to $2,000.00 a year for the support and education of grandchildren, *436 the trustee may expend $1800.00 a year to provide rearing and training for a "mongoloid" grandchild. In Re Besso's Estate, 220 N.Y.S.2d 475, 30 Misc.2d 766 (1961).
The intent of Charles Maurice Anderson, as that intent may be gleaned from the words and expressions that appear in his will, is our touchstone. That intent signals a broad discretion vested in the trustee. While equity among beneficiaries is certainly a factor to be considered, the trustee has clear authority to consider as well the special needs, aptitude and diligence of each beneficiary  to be as liberal as possible without allowing unfair advantage. Nothing in the testator's plan mandates equality in distributions, nor are trust benefits restricted to college education, nor are they available only to the young. Should one of the descendants of F.A. Anderson, Sr., prove exceptionally talented in music, the trustee may well finance (a reasonable portion of) that child's education at Julliard. And the same of another's pursuit of an M.B.A. at Wharton, or a third's attendance at Andover, or a young child's enrollment in a Montessori School. The trustee may purchase an Encyclopaedia Britannica for one beneficiary, a personal computer for another, athletic equipment for a third.
If perchance a problem of substance should arise regarding a particular expenditure, the Chancery Court, upon proper application, would have authority to afford such direction as may be needed. See Estate of Bunch v. Heirs of Bunch, 485 So.2d 284, 285-87 (Miss. 1986); In Re Estate of Hall, 193 So.2d 587, 591-92 (Miss. 1967).
Davis' other points are too devoid of merit to warrant discussion.

VII.
In conclusion, we affirm the final declaratory judgment of the Chancery Court entered April 10, 1987, with but a single, slight modification. Because we have waited and seen and all interests now contingent will vest or fail in less than twenty-one years following the last of the measuring lives, certain language of Paragraph I thereof has been rendered moot. Paragraph I of the judgment below should be, and it hereby is, amended so that it reads:
The objections to the validity of the trust interposed by Respondent, Howard W. Davis, are found to be without merit and the same are hereby dismissed; and the Court does now find and adjudicate that a valid trust was created under Item IX of the Last Will and Testament of Charles Maurice Anderson, and that the term of said trust commences on December 12, 1984, the date of the testator's death, and is to continue thereafter until December 21, 2009.[26]
The case is remanded for further proceedings in the execution of the last will and testament of Charles Maurice Anderson, deceased, and the administration of the estate and trust therein created, not inconsistent with this opinion.
APPELLANT'S MOTION FOR MODIFICATION OF OPINION GRANTED IN PART, DENIED IN PART. AFFIRMED AS MODIFIED.
ROY NOBLE LEE, C.J., HAWKINS, and DAN M. LEE, P.JJ., and PRATHER, SULLIVAN, ANDERSON and PITTMAN, JJ., concur.
BLASS, J., not participating.
NOTES
[1] For a recent construction of the word "descendants" in a testamentary trust, see Dodds v. Deposit Guaranty National Bank, 371 So.2d 878 (Miss. 1979).
[2] For our most recent, authoritative construction of the phrase "heirs of the body," see Posey v. Webb, 528 So.2d 833 (Miss. 1988).
[3] The descendants of F.A. Anderson, Sr., as of January 30, 1989, were:

A. Children of F.A. Anderson, Sr.
The sole issue and only children of the late F.A. Anderson, Sr. were Charles Maurice Anderson, Fred A. Anderson, Jr. and Helen J. Waitzman (formerly Helen J. Davis). Charles Maurice Anderson was never married and never adopted anyone; he died December 12, 1984, at age 80. Fred A. Anderson, Jr. died March 20, 1964, leaving children and descendants named hereinbelow. Helen J. Waitzman died February 15, 1981, leaving one child and descendants named hereinbelow.
B. Descendants of F.A. Anderson, Sr. through his son, Fred A. Anderson, Jr.
The sole issue and descendants of Fred A. Anderson, Jr. are as follows:
1. Fred A. Anderson, III, whose date of birth is October 15, 1941, now 47 years of age. He and his wife, Michelle Anderson, are the parents of the following children:
(a) Christine Antoine Anderson, whose date of birth is July 27, 1971, now 17 years of age; and
(b) Fred Alvin Anderson, IV, whose date of birth is October 18, 1973, now 15 years of age.
2. Mary Petty Anderson Caston, whose date of birth is March 25, 1948, now 40 years of age. She and former husband, Lester B. Caston, are the parents of the following children:
(a) Bramlette Caston, whose date of birth is March 27, 1973, now 15 years of age; and
(b) Keeton Caston, whose date of birth is September 7, 1976, now 12 years of age.
3. Polly Anderson Robertson, whose date of birth is October 4, 1945, now 43 years of age. She and her husband Gerald Melvin Robertson, are the parents of the following children:
(a) Drake Hawkins Anderson Robertson, whose date of birth is December 17, 1983, now 5 years of age; and
(b) Polly Douglas Robertson, whose date of birth is December 2, 1987, now 1 year of age. 4. David D. Anderson, whose date of birth is July 27, 1951, now 37 years of age. He and his wife, Patty Anderson, are the parents of one child, namely,
(a) Cassie Braswell Anderson, whose date of birth is May 13, 1985, now 3 years of age.
C. Descendants of F.A. Anderson, Sr. through his daughter, Helen J. Waitzman
The sole issue and descendants of Helen J. Waitzman are as follows:
1. Howard W. Davis, only child, whose date of birth is July 3, 1935, now 53 years of age, and today's Appellant. He and his first wife, Barbara S. Davis, are the parents of the following children:
(a) Peter Christian Davis, whose date of birth is August 10, 1965, now 23 years of age;
(b) Bret Wingfield Davis, whose date of birth is June 5, 1967, now 21 years of age;
(c) Christopher Eric Davis, whose date of birth is October 12, 1969, now 19 years of age; and
(d) Sean Fairchild Davis, whose date of birth is August 16, 1971, now 17 years of age.
Howard W. Davis and his present wife, Cynthia D. Davis, are the parents of one child, namely
(e) Howard Wingfield Davis, III, whose date of birth is July 8, 1986, now 2 years of age.
There are no descendants of F.A. Anderson, Sr. now deceased other than his three children, Charles Maurice Anderson, Fred A. Anderson, Jr., and Helen J. Waitzman.
[4] For further statement of and elaboration upon these policy statements, see Dukeminier, A Modern Guide to Perpetuities, 74 Calif.L.Rev. 1867, 1868-69 (1986); Restatement (Second) of Property (Donative Transfers), Pt. 1, Introductory Note (1981); Smith, Perpetuities in New Jersey: A Plea for Judicial Supremacy, 24 Rutgers L.Rev. 80, 81 (1969).
[5] On page one of The Common Law (1881), Holmes wrote (shockingly at the time): "The life of the law has not been logic: it has been experience." Forty years later he repeated the point more metaphorically: "... [A] page of history is worth a volume of logic." New York Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963, 983 (1921).
[6] Dukeminier, A Modern Guide To Perpetuities, 74 Calif.L.Rev. 1867, 1870 (1986).
[7] The antiquarian who wishes to pursue the history of the Rule would do well to begin with Haskins, Extending the Grasp of the Dead Hand: Reflections on the Origins of the Rule Against Perpetuities, 126 U. of Pa.L.Rev. 19 (1977).
[8] The so-called classic statement of the Rule is that of John Chipman Gray:

No interest is good unless it must vest, if at all, no later than twenty-one years after some life in being at the creation of the interest.
J. Gray, The Rule Against Perpetuities § 201 at 191 (4th ed. 1942). This statement of the Rule has been quoted in Carter v. Berry, 243 Miss. 321, 358, 140 So.2d 843, 846 (1962), and appears in our cases as early as 1922. Nichols v. Day, 128 Miss. 756, 763-64, 91 So. 451, 452 (1922). Magee v. Magee's Estate, 236 Miss. 572, 591-92, 111 So.2d 394, 402 (1959) states the Rule in somewhat different language and provides that the twenty-one year period be addended by any actual nine month period of gestation. See Dukeminier, A Modern Guide To Perpetuities, 74 Calif.L.Rev. 1867, 1872 (1986).
[9] See Dukeminier, Perpetuities: The Measuring Lives, 85 Colum.L.Rev. 1648, 1713 (1985).
[10] Treatment of the possibility of reverter affords one of the many anomalies in perpetuities jurisprudence. The possibility of reverter is regarded as a vested interest, and therefore not subject to the Rule, even though the circumstance which may cause the reverter may not occur for hundreds of years after the grant or devise. See Columbus & Greenville Railway Co. v. City of Greenwood, 390 So.2d 588, 591 (Miss. 1980); City of Laurel v. Powers, 366 So.2d 1079, 1082 (Miss. 1979); Jones v. Burns, 221 Miss. 833, 841, 74 So.2d 866, 868 (1954); compare Leach, Perpetuities In Perspective: Ending the Rule's Reign of Terror, 65 Harv.L.Rev. 721, 739-45 (1952); and 6 American Law of Property § 24.62, at 153-58 (A.Casner ed. 1952), republished as a separate volume as Leach and Tudor, The Rule Against Perpetuities § 24.62 (1957).
[11] Phelps v. Shropshire is cited with apparent approval in Restatement (Second) of Property (Donative Transfers) § 1.4, Reporter's Note 6, p. 70 and § 1.6, Reporter's Note 4, p. 102 (1981).
[12] Our Court has been commended as being the only court in the nation to refuse to follow the much criticized all-or-nothing rule for class gifts. Dukeminier, A Modern Guide to Perpetuities, 74 Calif.L.Rev. 1867, 1892 n. 81 (1986); see also Restatement (Second) of Property (Donative Transfers) § 1.5, Reporter's Note 6, pp. 92, 93 (1981).
[13] Our implied savings clause point requires explication, particularly in view of Davis' admonition that this Court should not be about the business of rewriting a testator's will, an admonition attended by citations to Ferguson v. Morgan, 220 Miss. 266, 271, 70 So.2d 866, 867 (1954); and Jones v. Carey, 122 Miss. 244, 248, 84 So. 186, 187 (1920). The past three decades have produced case after case where we construed a devise, arguably technically deficient, to effect or approximate the testator's dominant intent. May v. Hunt, 404 So.2d 1373, 1381 (Miss. 1981) (equitable approximation); In Re Estate of Kelly, 193 So.2d 575, 578 (Miss. 1967) (equitable approximation); Carter v. Berry, 243 Miss. 321, 370-76, 140 So.2d 843, 852-55 (1962) (cy pres and equitable approximation); see also In Re Estate of Hall, 193 So.2d 587, 592 (Miss. 1967) (power to supplement provisions of testamentary charitable trust). The point is summed up in Estate of Bunch v. Heirs of Bunch, 485 So.2d 284, 285 (Miss. 1986):

Whatever may once have been the law in this state, it is much too late to question the authority and responsibility of this Court to amend or supplement the terms of a will  whether its devise be private or charitable in nature  where such is necessary to effect the testator's dominant intent and avoid a clearly unintended consequence.
Estate of Bunch, 485 So.2d at 285 [Emphasis supplied]; see also Tinnin v. First Bank of Mississippi, 502 So.2d 659, 664, 669 (Miss. 1987). The reason we may read these cases as authorizing an implied savings clause is simple. No sensible individual executes a will intending or anticipating that it will fail. Indeed, there is no assumption more certain, and thus more reasonable, than that the maker of a will intends and expects that its directives be carried out. Implied terms or conditions judicially added to private expressions should be only those reasonably within the contemplation of the author. Certainly to be included are those so obvious that it may not occur to the average author that they need be expressed. It defies common sense to suggest that the maker of a will does not contemplate and intend that his will be amended or supplemented where such is necessary to give effect to his dominant intent and avoid a discordant consequence. See Dukeminier, supra, 74 Calif.L.Rev. at 1899-1900; Dukeminier, The Uniform Statutory Rule Against Perpetuities: Ninety Years in Limbo, 34 U.C.L.A.L. Rev. 1023, 1071 (1987). And, as to the charge that this involves the court in rewriting a person's will, only a slight shift of attitude away from the dead hand of legal formalism is required to see that striking the devise may often be a far more radical rewriting of the will than modifying it and saving it.
Thought of the content of such a savings clause is aided by perusal of actual savings clauses, see Leach and Logan, Perpetuities: A Standard Savings Clause to Avoid Violations of the Rule, 74 Harv.L.Rev. 1141 (1961); 2 Murphy's Will Clauses § F13, Form 6:80 (1988).
[14] Dukeminier, A Modern Guide to Perpetuities, 74 Calif.L.Rev. 1867, 1873 (1986); Dukeminier, Perpetuities: The Measuring Lives, 85 Colum.L. Rev. 1648, 1650 (1985); Restatement (Second) of Property (Donative Transfers) § 1.3, comment b (1981).
[15] Dukeminier, supra, 85 Colum.L.Rev. at 1650.
[16] The full quote from Gray is

Every provision in a will or settlement is to be construed as if the Rule did not exist, and then to the provision so construed, the Rule is to be remorselessly applied.
J. Gray, The Rule Against Perpetuities § 629 (4th ed. 1942). We once followed Gray. Henry v. Henderson, 103 Miss. 48, 60 So. 33, 40 (1912). That this quotation appears in the dissenting opinion in May v. Hunt, 404 So.2d at 1382, may but serve to remind that frequently all a dissenting opinion accomplishes is making clear the approach that has been rejected by the majority. Beyond this we cannot resist noting that Gray's grandson, Owen Tudor, has uttered upon the Rule, together with Prof. W. Barton Leach, in The Rule Against Perpetuities (1957), which is dedicated:
 TO JOHN CHIPMAN GRAY
 Grandfather of one of us
 professional forebear of both
 who in his juridical Valhalla
 may well realize
 that his "remorseless" Rule
 was more appropriate
 to his time than to ours
[Emphasis in original].
[17] On the matter of Anderson's intent, we do not ignore Henry v. Henderson, 103 Miss. 48, 69, 60 So. 33, 40 (1912) to the point that the very object of the Rule "is to defeat intention." Henry, of course, relies upon Gray. Leach and Tudor have this to say:

One sentence from Gray's pungent paragraph on this subject should be mentioned. He says, referring to the Rule against Perpetuities, "Its object is to defeat intention." We are well aware of what Gray had in mind in writing that sentence; unquestionably the Rule defeats the testator's intention when it invalidates an interest, and no expression of intention that the Rule shall not apply to his will is effective. Still, Gray's expression is unfortunate. The object of the Rule is to restrict the tying up of property to permissible limits. To attain this end it will defeat the intention of a particular testator, if necessary. The public interest must prevail over private wishes. But the Rule has no punitive aspect  indeed, if it did, the fact that the testator has already passed into the jurisdiction of a higher law would raise serious difficulties of enforcement. It is consistent with the status of the Rule as a precept of social policy that every possible measure should be taken to bring a testator's will into conformance with it rather than to find a violation of the law's prohibition.
Leach and Tudor, The Rule Against Perpetuities, § 24.46, pp. 121-22 (1957) [Emphasis in original].
[18] Dukeminier, 74 Calif.L.Rev. at 1880; Leach, Perpetuities In Perspective: Ending the Rule's Reign of Terror 65 Harv.L.Rev. 721, 730 (1952).
[19] The measuring lives under wait-and-see are the same lives relevant under what-might-happen: those causally related to vesting. Dukeminier, 74 Calif.L.Rev. at 1881-82.
[20] Our cases have not yet fleshed out the meaning of our wait-and-see doctrine. One objection to wait-and-see is the practical problems that may result from not knowing whether an interest is valid or void, perhaps for several decades. See R. Powell, The Law of Real Property §§ 827[A]  827[H] (P. Rohan rev. ed. 1986); see also Simes and Smith, The Law of Future Interests § 1230 (2d ed. 1956). Here we only had to wait and see for four years and nine days from December 12, 1984, a period which, alas, because of the slow pace of litigation, has come and gone. We have not concerned ourselves with the outer limits of wait-and-see and nothing said here should be taken as expressing a view on the point.
[21] 6 American Law of Property § 24.16, at 52 (A. Casner ed. 1952).
[22] Our selection of the form of rules or standards as means to the achievement of societal objectives has always been problematical. See, e.g., Kennedy, Form and Substance in Private Law Adjudication, 89 Harv.L.Rev. 1685, 1687-1701 (1976); and Hart, The Concept of Law 121-32 (1961). We know of no rule more infected with the twin diseases of over-inclusiveness and under-inclusiveness than the Rule.
[23] It is no exaggeration to suggest that "there is agreement among virtually all of the commentators and experts in the field that the Rule against Perpetuities is in need of reform." Waggoner, Perpetuity Reform, 81 Mich.L.Rev. 1718 (1983). Out of exasperation with the continuing power of the dead hand of John Chipman Gray, many states have opted for statutory reform of the Rule, the new Uniform Statutory Rule being only the latest and most prominent of such efforts. With the three judicial ameliorations in being in this state  wait-and-see, abolition of all-or-nothing in class gifts, and implied savings clause  there would appear no need here for legislation on the subject. See Dukeminier, The Uniform Statutory Rule Against Perpetuities: Ninety Years in Limbo, 34 U.C.L.A.L.Rev. 1023 (1987); Smith, Perpetuities in New Jersey: A Plea for Judicial Supremacy, 24 Rutgers L.Rev. 80 (1969).
[24] Tideway quotes from and relies upon dissenting views of Chief Justice Arthur T. Vanderbilt uttered in a context quite like unto today's. Fox v. Snow, 6 N.J. 12, 23, 76 A.2d 877, 883-84 (1950), quoted in Tideway, 431 So.2d at 466-67.
[25] Davis' remainder vested upon creation. The gift over to his heirs, if Davis dies before the end of the trust, is valid under the old common law what-might-happen Rule if the "heirs of his body" are ascertained at his death. If Davis dies within twenty-five years, the executory interest in his heirs will divest his vested remainder and become a vested remainder upon his death. Davis is the validating life. Wait-and-see is not necessary to save it.

If, on the other hand, the heirs of Davis' body are not ascertained until twenty-five years after the testator's death, the heirs' interest violates the common law Rule and wait-and-see is necessary to save it. Under the common law, validity depended upon the time when the heirs of Davis were ascertained.
Under the common law Rule, heirs were ascertained at an ancestor's death  not at some later time. But in some exceptional cases heirs were determined at the time of possession. See 5 American Law of Property § 22.60(a) (standard rule) and (c) (exceptions) (A. Casner ed. 1952). None of the exceptions applies in this case.
In the view we take, it is unnecessary to determine when Davis' heirs are ascertained because in any case their interest is valid under wait-and-see.
[26] The reason why the trust does not terminate until December 21, 2009, is found in the language of Item IX of Testator's will which provides that the twenty-five year period runs "from the date of the admission of this last will and testament for probate." The will was admitted for probate on December 21, 1984.